IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BKMJ, INC.; and
BRENT SOUTER                                                                              PLAINTIFFS

V.                           CASE NO. 5:15-cv-05144

JACK COOPER HOLDINGS CORP.; and
JACK COOPER TRANSPORT COMPANY, INC.                                 DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

Currently before the Court are Defendants' Motion to Dismiss (Doc. 6) and Brief in Support (Doc. 7), Plaintiffs' Response (Doc. 11), and Defendants' Reply (Doc. 13). The Court held a hearing on the Motion on September 14, 2015, and after oral argument **GRANTED IN PART AND DENIED IN PART** Defendants' Motion from the bench. This Opinion and Order explains the basis for the Court's decision. To the extent anything in this Order differs from what the Court stated from the bench, this Order will control.

**I. BACKGROUND**

This diversity case involves a contract dispute between Plaintiffs BKMJ, Inc. and Brent Souter, and Defendants Jack Cooper Holdings Corp. (the "Holding Company") and Jack Cooper Transport Company, Inc. (the "Transportation Company") (collectively "Cooper"). The Transportation Company is a Delaware corporation with its principal place of business in Kansas City, Missouri. The Holding Company is a Delaware corporation with its principal place of business in Kennesaw, Georgia. Cooper is the largest over-the-road transporter of light vehicles in both the U.S. and Canada. Brent

1

Souter is the former Chief Financial Officer for Cooper. BKMJ, Inc. is an Arkansas corporation with its principal place of business in Springdale, Arkansas. Souter performs consulting services through BKMJ, which he presumably owns or controls, although the exact relationship is not detailed in the filings.

The parties agree that on February 1, 2011, Souter entered into a Termination and Restrictive Covenants Agreement with Cooper (the "Termination Agreement").[1] The Termination Agreement provided that Cooper would pay Souter $100,000.00 within 10 days of execution of the agreement and then $20,000.00 per month from July 1, 2011 until January 1, 2015. In exchange, Souter agreed to a series of restrictions, including non-competition, non-solicitation, and confidentiality clauses, continuing for the same duration as the payments. The Termination Agreement was signed and executed on behalf of Cooper by its then-CEO Robert Griffin, and by Souter, on February 1, 2011. The filings also reference a separate consulting agreement between the parties, apparently entered into around the same time, pursuant to which Cooper had been making payments to BKMJ for Souter's consulting services.

Over two years later, in December of 2013, Cooper finalized the purchase and acquisition of its competitor, Allied Systems Holding, Inc. ("Allied"). According to Souter, he "played an integral part in the due diligence, purchase and acquisition" of Allied, and invested his time, personal knowledge, and skills beyond the expectations of the parties at the time the Termination Agreement was executed. (Doc. 1, p. 3). Souter was compensated for his time pursuant to the separate consulting agreement, which was billed through Souter's consulting company, BKMJ.

---

[1] The parties do quibble as to whether the Holding Company was a party to the Termination Agreement, discussed *infra* Section III(A).

On November 25, 2013, Souter met with Michael Riggs, majority owner and Chairman/CEO of Cooper in Kennesaw, Georgia. Souter contends that the purpose of the meeting was to "finalize the nature of Souter's financial reward for his past and continued work on the Allied acquisition . . . ." (Doc. 1, p. 4). That afternoon, Souter and Riggs purportedly came to an oral agreement to extend the terms of the Termination Agreement for an additional four years, beginning February 1, 2015. After the meeting, Souter claims that he informed Griffin of the agreement, and that Griffin in turn informed Mike Testman, Chief Financial Officer of Cooper, and Theo Ciupitu, General Counsel for Cooper, of the deal. Later, Ciupitu prepared a document referred to in the pleadings as the Revised RCA ("Draft Revised Agreement"). This document is a so-called "redlined" version of the Termination Agreement, the terms of which continue the $20,000.00 monthly payments from February 1, 2015, through January 1, 2019. In exchange, the terms impose on Souter essentially the same restrictions listed in the Termination Agreement and extend them to cover the Allied acquisition. Ciupitu emailed this document, along with a "clean" (non-redlined) version, to Griffin on January 3, 2014.

By August 25, 2014, the Draft Revised Agreement remained unsigned by both parties. On that date, Griffin sent the following email to Riggs (the "Griffin Email"):

> Mike, Brent has asked me several times and most recently with my leaving, to formalize the attached agreement which you and he agreed earlier this year, post Allied. It is simply a 4 year extension of the 2011 agreement ($20,000/month for 48 months beginning 2015) but does not provide for consulting payments (but accommodates reasonable consulting time when asked) as the past agreement. I obviously don't want to sign anything at this point so wanted to make sure you were aware that this has yet to be executed. Mike Testman may want to look at the final agreement to properly manage accounting points.

3

(Doc. 1-3, p. 1). Two documents were attached. The first was titled "Brent Souter – Allied Restrictive Covenants Agrmt (JC draft).doc," and the second was titled "Brent Souter Redline Feb 2011 vs Sept 2013.docx." *Id.* It appears that these were the same two documents previously emailed by Ciupitu to Griffin on January 3, 2014. The email concluded with an automated signature line including Griffin's name and title. On September 11, 2014, Griffin forwarded the email to Souter, adding only "This was the draft" followed by his automated email signature information and the two attached documents. *Id.*

While the Draft Revised Agreement remained unsigned, BKMJ invoiced the Transportation Company for $20,000.00 on both February 1, 2015, and March 1, 2015—the would-be first two payment periods under the Draft Revised Agreement and alleged oral contract. The Transportation Company paid the invoices, which reference the payments as being for "Agreed Consulting Fees." (Doc. 1-4). These were the last payments made by Defendants to Plaintiffs.

Plaintiffs filed their Complaint on July 1, 2015, listing three bases for recovery. In Count I Plaintiffs charge Defendants with breaching the alleged oral contract entered into on November 15, 2013. Count II alternatively argues that Defendants breached their oral contract with Souter, and asks this Court to reform the contract so that its duration is only twelve months. Count III, again pled in the alternative, asks that if the Court does not find an oral contract, it award damages under the doctrine of promissory estoppel.

In response to the Complaint, Defendants have filed a Motion to Dismiss under Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. Defendants argue

that this Court lacks personal jurisdiction over the Holding Company, but do not dispute jurisdiction over the Transportation Company. Defendants then assert that Plaintiffs have failed to state a claim upon which relief can be granted because Plaintiffs' Counts I and II are barred by the Statute of Frauds and Count III was not pled with sufficient particularity so as to state a facially plausible cause of action.

## II.  LEGAL STANDARDS

### A.  Defendants' 12(b)(2) Motion to Dismiss the Charges Against the Holding Company

Defendants contend that the Holding Company lacks the minimum contacts with Arkansas required under the Due Process Clause of the United States Constitution for this Court to have jurisdiction over it. "To allege personal jurisdiction, 'a plaintiff must state sufficient facts in the complaint to support a reasonable inference that the defendant can be subjected to jurisdiction within the state.'" *Wells Dairy, Inc. v. Food Movers Int'l*, 607 F.3d 515, 518 (8th Cir. 2010) (quoting *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004)) (alteration omitted). "If the defendant controverts or denies jurisdiction, the plaintiff bears the burden of proving facts supporting personal jurisdiction. The plaintiff's prima facie showing must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and opposition thereto." *Id.* In determining whether the plaintiff has made a prima facie showing, the Court "must view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in the plaintiff's favor." *Digi-Tel Holdings, Inc. v. Proteq Telecomm. (PTE), Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996).

This Court cannot exercise personal jurisdiction over a non-resident defendant unless doing so comports with both the Arkansas long-arm statute and the due process

5

requirements of the United States Constitution. *Id.* The Arkansas long-arm statute authorizes the exercise of personal jurisdiction "to the maximum extent permitted by the due process clause of the Fourteenth Amendment of the United States Constitution." Ark. Code Ann. § 16-4-101.  Therefore, the only question here is whether the exercise of personal jurisdiction over the Holding Company is constitutionally permissible.

To be constitutionally permissible, the Due Process Clause "requires 'minimum contacts' between the non-resident defendant and the forum state such that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice,'" and "such that [the] defendant 'should reasonably anticipate being haled into court there.'" *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92, 297 (1980); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). There are two types of personal jurisdiction: general and specific. The latter is exercised "[w]hen a cause of action arises out of or is related to a defendant's contacts with the forum state," while the former is exercised if the defendant's "contacts with the state are continuous and systematic." *Epps v. Stewart Information Services Corp.*, 327 F.3d 642, 648 (8th Cir. 2003); *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n.8 (1984).

The Eighth Circuit has harmonized these constitutional requirements into a five-factor test that must be used to determine the sufficiency of a non-resident defendant's contacts with the forum state: (1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5)

convenience of the parties. *Epps*, 327 F.3d at 648. The first three of these factors are the most important. *Id.* Additionally, a parent corporation may be subject to a court's personal jurisdiction through the contacts of its subsidiary if the subsidiary constitutes the "alter ego" of the parent. *E.g.*, *Anderson v. Dassault Aviation*, 361 F.3d 449, 452-53 (8th Cir. 2004).

Finally, in contract cases, "personal jurisdiction is proper where the defendant 'reach[es] out beyond one state and create[s] continuing relationships and obligations with citizens of another state.'" *Creative Calling Solutions, Inc. v. LF Beauty Ltd.*, 2015 WL 4978774, at *3 (8th Cir. Aug. 21, 2015 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985)) (internal citations omitted). But contracting with a citizen of a state alone is insufficient to establish minimum contacts. "To determine whether a defendant purposefully established minimum contacts with the forum, we must evaluate 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *Id.* (quoting *Burger King,* 471 U.S. at 479).

## B. Defendant's 12(b)(6) Motion to Dismiss

To survive a motion to dismiss pursuant to Rule 12(b)(6), the complaint must present "a short and plain statement of the claim that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The intention of this is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In evaluating the sufficiency of the complaint, the Court assumes that "all factual allegations in the pleadings are true and interpret[s] them in the light most favorable to the nonmoving

party." *Bell v. Pfizer, Inc.*, 716 F.3d 1087, 1091 (8th Cir. 2013) (internal quotation omitted).

Even so, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). In short, "the pleading standard that Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). When considering a motion to dismiss, the Court ordinarily does not consider matters outside the pleadings, Fed. R. Civ. P. 12(d), but may consider exhibits attached to the complaint and documents that are necessarily embraced by the pleadings. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

### III. DISCUSSION

#### A. This Court's Jurisdiction Over the Holding Company

Plaintiffs first argue that this Court has specific jurisdiction over the Holding Company through its direct contacts with Arkansas. Additionally, Plaintiffs contend that this Court has general jurisdiction over the Holding Company, or that jurisdiction exists because the Transportation Company's contacts can be imputed on to the Holding

Company through an alter ego theory. The Court does not need to reach the latter two issues, however, because the Holding Company's direct contacts with Arkansas are sufficient to create specific jurisdiction.

The Holding Company's contacts with Arkansas arise primarily from the Termination Agreement and alleged subsequent contract with Souter, and from the employment and consulting relationship it maintained with Plaintiffs. First, despite Defendants' contention to the contrary, the Court finds that the Holding Company was an intended party to the Termination Agreement and the Draft Revised Agreement. The Termination Agreement declares that "this '**Agreement**' is made and entered into . . . by and between: (a) Jack Cooper Transportation Company, Inc., a Delaware corporation (the "**Company**"; and together with its Affiliates (as hereinafter defined), *parents*, subsidiaries, divisions, subdivisions, benefits plans, successors, and assigns, the "**Jack Cooper Parties**"); and (b) J. Brent Souter ("**Souter**")." (Doc. 1-1 p. 1 (bold and underline original, italics added)). Defendants' declarant Katie Helton, who is the Executive Vice President, Assistant Secretary, and Associate General Counsel of the Holding Company, admits that the Holding Company is the Transportation Company's parent.

The Draft Revised Agreement includes a nearly identical definition of the parties to the agreement, including the reference to the Transportation Company's "parents." (Doc. 1-2, p. 1). Moreover, the Draft Revised Agreement was prepared by Ciupitu, Executive Vice President and General Counsel for *both* the Transportation Company and the Holding Company. The oral contract which the Draft Revised Agreement supposedly memorialized was agreed to by Souter and Riggs, who is referred to in the

Complaint as "majority owner and Chairman/CEO of Jack Cooper," a defined term meaning *both* the Holding Company and the Transportation Company. (Doc. 1, p. 4).

The Holding Company is also protected to the same extent that the Transportation Company is by the terms of the contract: Souter is prohibited from "induc[ing] any employee of any **Jack Cooper Party** to leave"; "induc[ing] any customer, supplier, [or] vendor . . . of any **Jack Cooper Party**" to "cease doing business with . . . such **Jack Cooper Party**"; making communications which disparage or damage "any **Jack Cooper Party's** reputation or business"; and revealing any "proprietary or confidential information relating to the **Jack Cooper Parties**." (Doc 1-1, p. 5 (emphasis added)). Further evincing the parties' clear intent that the Holding Company be party to the agreements, the Termination Agreement gives the "**Jack Cooper Parties**" the right to assign the agreement and their rights under the agreement, (Doc. 1-1, p. 8 (emphasis added)), and the Draft Revised Agreement declares that the agreement "shall . . . inure to the benefit of *only* **the parties hereto** and their respective successors, permitted assigns, and personal representatives" and then gives the "**Jack Cooper Parties**" the right to assign the agreement. (Doc. 1-2, p. 9 (emphasis added)).

Finally, Defendants do not deny the Complaint's assertion that Souter was the CFO of both the Transportation Company and the Holding Company. Given this, it would be inconsistent for this Court to determine that the Holding Company was not a party to the contract that terminated Souter's employment with it.

Second, Souter and the Holding Company carried on a long-term employment and consulting relationship contacting Arkansas. The Complaint lists Souter as a

resident of Arkansas during all relevant times, and refers to him as the former Chief Financial Officer for "Jack Cooper," a defined term meaning both the Transportation Company and the Holding Company. (Doc. 1, p. 1-2). The filings also detail that Souter stepped down as CFO after declining to comply with Cooper's request to move his family to Kansas City, Missouri. Taken together, and viewing the facts in the light most favorable to Plaintiffs, Souter was employed by the Holding Company while working from Arkansas for the duration of his employment, creating a relationship consistently contacting the state.

Again viewing the facts in the light most favorable to Plaintiffs, at least part of the purpose of the alleged oral contract was to further compensate Souter for the consulting work he performed during the purchase and acquisition of Allied *by the Holding Company*. The filings also indicate that Souter's consulting work related to the Allied acquisition was performed by and paid to BKMJ, an Arkansas corporation with its principal place of business in Springdale.[2]

These contacts easily suffice to meet the Eighth Circuit's five-part standard for personal jurisdiction. *Epps,* 327 F.3d at 648. Plaintiffs' cause of action revolves around the employment relationship between Souter and both Defendants, the alleged contract between Souter and both Defendants, and the consulting work on the Allied acquisition performed by Plaintiffs for both Defendants. The quantity and quality of contacts by the Holding Company with Arkansas were substantial. The Holding Company employed Souter while he lived and worked in Arkansas. The Holding Company was party to a

---

[2] Although the payments to BKMJ were made by the Transportation Company, the contact is still relevant for the purpose of the minimum contacts inquiry because the payment was for services provided *to the Holding Company* by Plaintiffs, an Arkansas resident and an Arkansas corporation.

contract, and a second alleged contract, that involved making monthly payments to an Arkansas resident for several years in return for restrictions on the resident lasting for the same duration. The Holding Company also utilized an Arkansas corporation for consulting services. Lastly, Arkansas has an interest in providing a forum for its resident and resident corporation, and the forum presents no unusual inconvenience for the Holding Company.

In sum, the course of dealings between the Holding Company and Plaintiffs is sufficient to create minimum contacts. Plaintiffs have sufficiently stated facts in their Complaint to support a reasonable inference that the Holding Company can be subjected to jurisdiction in Arkansas, and the Holding Company should "reasonabl[y] anticipate being haled into court" here. *World-Wide Volkswagen Corp.*, 444 U.S. at 297.

### B. Defendant's Motion to Dismiss Count I

Plaintiffs' Count I must be dismissed because the statute of frauds of both Missouri and Arkansas[3] prevent the alleged oral contract from being enforced.[4]

#### 1. The Griffin Email Does Not Satisfy the Statute of Frauds

Arkansas' statute of frauds declares that any contract "that is not to be performed within one (1) year from the making of the contract" is void unless it is written and

---

[3] The parties have briefed the Court using both Missouri and Arkansas law, and neither has taken a firm position on which state's law applies to the dispute. The Court does not need to decide which state's law applies at this time.

[4] In its ruling from the bench, the Court viewed Section 9(d) of the Termination Agreement as being significant to the legal analysis. Having reviewed the issue further, the Court believes its ruling is better grounded on the statute of frauds analysis. This is true because a written agreement can–under certain circumstances–be orally modified, despite a contractual "written amendments only" provision. *See Amerifactors Financial Group LLC v. Windstream Supply LLC*, 2014 WL 4168366 (E.D. Ark. Aug. 20, 2014); *Jennings v. SSM Health Care St. Louis*, 355 S.W. 3d 526 (Mo. Ct. App. 2011).

signed, or there is a signed memorandum or note. Ark. Code Ann. § 4-59-101. Missouri's statute of frauds includes a materially identical provision. Mo. Rev. Stat. § 432.010. "The question of whether a writing constitutes a confirmation of an oral agreement sufficient to satisfy the statute of frauds is a question of law for the court." *Gen. Trading Int'l, Inc. v. Wal-Mart Stores, Inc.*, 320 F. 3d 831, 835-36 (8th Cir. 2003).

Plaintiffs contend that the Griffin Email constitutes a signed memorandum sufficient to satisfy either statute of frauds. However, the Court finds that the Email is not sufficient to indicate the existence of an oral contract.

While it is true that the Email includes the phrase "attached agreement which you and he agreed earlier this year" coupled with an explanation of the terms listed in the attachments (Doc. 1, p. 5), these phrases must be considered in the context of the Email. Read as a whole, the Email is clearly not a memorialization of an oral contract. For example, it suggests that "Mike Testman may want to look at a final agreement to properly manage accounting points." (Doc. 1-3, p. 1). Griffin states that he "wanted to make sure you [Riggs] were aware that this has yet to be executed." (Doc. 1-3, p. 1 (parenthetical added)). The attachments include a document titled a "draft", and when he forwarded the Email and attachments to Souter, Griffin referred to the attachments as a "draft." (Doc. 1-3, p. 1). Moreover, the Email was sent by a person who lacked first-hand knowledge of whether an oral contract had been formed. The supposed oral contract was negotiated on November 25, 2013, between Souter and Riggs. Yet, the email in question was sent by Griffin.

These ambiguities and issues with the Griffin Email make a finding that it is not sufficient to satisfy the statute of frauds consistent with persuasive case law. In *Cobb v.*

*S. Plaswood Corp.*, 171 F. Supp. 691 (W.D. Ark. 1959), the court declined to find that a series of letters constituted a confirmatory writing, in part, because the writings were as consistent with the defendant's version of the oral contract as they were with the plaintiff's. *Id.* at 699-700. *Eagle Tech. v. Expander Americas, Inc.*, 783 F.3d 1131 (8th Cir. 2015), involved the application of Arizona's statute of frauds provision regarding contracts that cannot be performed within one year. There, the Eighth Circuit determined that an email stating, in part, "all is good" was insufficient to confirm the existence of a written agreement because it was ambiguous as to which attached document the statement referred to. *Id.* at 1138. While the Griffin Email is unambiguous as to what subject matter it refers to, it is ambiguous as to whether it is memorializing the existence of a contract or is instead forwarding the terms of a proposed contract.

The Court also draws guidance from cases interpreting Arkansas' and Missouri's adoptions of the UCC § 2-201(2). *See* Ark. Code Ann. § 4-2-201(2); Mo. Ann. Stat. § 400.2-201(2).[5] Section 2-201 requires contracts for the sale of goods over $500.00 to be in writing, but makes an exception for transactions between merchants when one merchant sends a confirming memorandum to which the other does not object within ten days. *See* Ark. Code Ann. § 4-2-201(2); Mo. Ann. Stat. § 400.2-201(2). In determining whether a writing suffices as a confirming memorandum, Arkansas and Missouri courts have held that a memorandum must be sufficient to indicate that a contract has been made. *E.g.*, *Howard Const. Co. v. Jeff-Cole Quarries, Inc.*, 669 S.W. 2d 221, 227 (Mo. Ct. App. 1983); *Harvest Rice, Inc. v. Fritz & Mertice Lehman Elevator & Dryer, Inc.*, 365 Ark. 573, 577 (2006). "Most courts have required that the writing

---

[5] Although this case does not involve the UCC, the Court finds that case law interpreting UCC § 2-201 is highly analogous to the statute of frauds issue in this case.

14

indicate the consummation of a contract, not mere negotiations." *Howard*, 669 S.W. 2d at 227 (listing cases). "Thus, *writings that contain language evincing a tentative agreement* or writings that lack language indicating a binding or complete agreement have been found insufficient." *Gen. Trading Int'l, Inc.*, 320 F. 3d at 836 (emphasis added) (citing *Howard*, 669 S.W. 2d at 227). Applying this standard, the Eighth Circuit in *Gen. Trading Int'l, Inc.*, 320 F. 3d at 831, found an email declaring in part that "I will be taking a [markdown] on this either next week or the following" was insufficient to satisfy the statute of frauds because it did not evince that a contract between the parties had been reached. *Id.* at 836-37.

Due to the several ambiguities and issues in the Griffin Email, this Court thinks it is closely analogous to writings previously deemed insufficient in similar circumstances by other courts. The email "does not provide a sufficiently clear declaration . . . to satisfy the statute of frauds." *Eagle Tech*, 783 F. 3d at 1139.

### 2. The Parties' Performance Does Not Satisfy the Statute of Frauds

A contract within the statute of frauds can still be enforced if a party has fully, or sometimes partially, performed. *E.g.*, *French v. Castleberry*, 238 Ark. 1038 (1965); *Stoetzel v. Cont'l Textile Corp. of Am.*, 768 F. 2d 217 (8th Cir. 1985). Plaintiffs argue "that Brent Souter fully performed or executed his obligations under the agreement by providing services through the completion of the Allied acquisition." (Doc. 11, p. 8). It befuddles the Court to see how this could be so. Plaintiffs state that the agreement made by Souter and Riggs was to extend the Termination Agreement for an additional four years (including certain restrictive covenants), and that the Draft Revised Agreement and the Griffin Email memorialized the terms of this agreement. Under

Plaintiffs' own description of the oral agreement, Souter's performance obligations extend until January 1, 2019. Besides, the Draft Revised Agreement does not contain any requirement for Souter to perform consulting work. Souter could not possibly have fully performed on the alleged contract within one year.

Partial performance will take a contract out of the statute of frauds only in limited situations. As a threshold matter, in both Arkansas and Missouri, partial performance will satisfy the statute of frauds "only in equitable actions, not in cases at law." *Stoetzel*, 768 F. 2d at 223 (citing *Shy v. Lewis,* 12 S.W. 2d 719, 720 (1928)); *Cobb*, 171 F. Supp. at 702-03 ("It is well settled that oral contracts that are not to be performed within a year are not taken out of the statute by part performance except in certain cases in which real estate is involved or in which specific performance would be decreed."); *see also Genovese v. DCA Food Indus., Inc.*, 911 F. Supp. 378, 380 (E.D. Mo. 1996) ("[T]he doctrine of part performance has no application to an action at law for breach of contract, except in certain cases in which real property is involved."). Accordingly, partial performance is not available to Plaintiffs as a defense to the application of the statute of frauds in this breach of contract action.

Even if it were available, the Court would decline to find the statute of frauds satisfied by the partial performance in this case. For partial performance to take an oral contract out of the statute of frauds, it must be "solely referable to the oral agreement." *Moore v. Wallace*, 90 Ark. App. 298, 301 (Ark. Ct. App. 2005) (citing *Smith v. Malone,* 83 Ark. App. 99 (Ark. Ct. App. 2003)); *see also Meegan v. Illinois Sur. Co.*, 193 S.W. 899, 900 (Mo. Ct. App. 1917) ("[P]erformance must have undoubtedly been done in obedience to the verbal contract. If such performance may be reasonably referable to

some other contract, or some other motive, it will not affect the application of the statute.").

In the case at bar, Plaintiffs argue that Souter partially performed by working on the Allied acquisition, and that Defendants partially performed by making payments of $20,000.00 in February and March of 2015. However, these actions are not solely referable to the supposed oral contract. The filings indicate that the parties had a separate agreement in place for Plaintiffs' consulting services. Souter's work on the Allied acquisition is certainly attributable to the consulting agreement. The $20,000 payments could be referable to that agreement as well, or to a shorter term or at-will consulting agreement. Moreover, if, as Plaintiffs argue, the Draft Revised Agreement is a memorialization of Souter's oral contract with Defendants, then his work on the Allied acquisition would not constitute even partial performance on the contract. The terms of the Draft Revised Agreement do not include any reference to the performance of consulting work.

In sum, viewing the facts in the light most favorable to Plaintiffs, Count I fails to state a claim upon which relief can be granted as a matter of law. Enforcement of the oral contract alleged by Plaintiffs is barred by both the Arkansas and Missouri statutes of frauds. Count I is therefore **DISMISSED**.

### C. Defendants' 12(b)(6) Motion to Dismiss Count II

Count II of the Complaint alternatively argues that "if the oral contract is found to not have been executed, the Plaintiff is entitled to enforcement of the new agreement for a period of 12 months." (Doc. 1, p. 7-8). The Court reads this somewhat cryptic pleading as a request to interpret the alleged oral agreement as lasting only one year in

duration, beginning on February 1, 2015. Plaintiffs insist that the Court has the authority to reform the alleged agreement in this manner pursuant to the recently passed Arkansas General Assembly Act 921 of 2015. The Act gives courts the authority to reform unreasonable non-compete agreements in order to make them enforceable.

Even assuming that this Court has the authority to reform the oral agreement under Act 921—a dubious proposition—doing so would not save Count II from dismissal. Count II is premised on Plaintiffs' misunderstanding of the statute of frauds. In both Arkansas and Missouri, the statute of frauds applies to contracts that cannot be performed with one year *of the making of the contract*. Ark. Code Ann. § 4-59-101; Mo. Rev. Stat. § 432.010. Plaintiffs state throughout their filings that the contract was made on November 25, 2013. Even if the Court reformed the contract as Count II asks, it would not have taken effect until February 1, 2015, and could not be fully performed until January of 2016. Therefore, Plaintiffs' attempt to avoid the effect of the statute of frauds through their alternative pleading in Count II is ineffective. Plaintiffs' Count II fails to state a claim upon which relief can be granted, and is **DISMISSED**.

### D.  Defendants' 12(b)(6) Motion to Dismiss Count III

Plaintiffs' Count III asks the Court to find that the doctrine of promissory estoppel applies to Souter's alleged oral contract with Defendants. Promissory estoppel has four elements "(1) a promise; (2) on which a party relies to his or her detriment; (3) in a way the promisor expected or should have expected; and (4) resulting in an injustice that only enforcement of the promise could cure." *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W. 3d 588, 590 (Mo. 2007); *see also Van Dyke v. Glover*, 326 Ark. 736, 745 (1996).

Viewing the facts in the light most favorable to Plaintiffs, they have made a facially plausible claim for promissory estoppel. The oral agreement allegedly entered into by Souter and Cooper was for a four-year extension of the Termination Agreement. Under the Termination Agreement, Souter was subject to several restrictions, including a non-compete clause. Relying on Defendants' alleged promise that the Termination Agreement would be extended for four additional years, it is at least plausible that Souter acted to his detriment by declining to accept or pursue business opportunities. It is further plausible that Souter's reliance was reasonable. The Complaint shows that the Transportation Company made two payments of $20,000.00 to BKMJ coinciding with the first two months of the alleged agreement. It may have been reasonable for Souter to begin performing his end of the bargain in reliance on receiving these payments. Defendants' motion to dismiss Count III of the Complaint is, accordingly, **DENIED**.

## IV. CONCLUSION

For the reasons explained herein, Defendants' Motion to Dismiss (Doc. 6) is **GRANTED IN PART AND DENIED IN PART** as follows: Defendants' Motion is **GRANTED** with respect to Counts I and II, and **DENIED** with respect to Count III.

**IT IS SO ORDERED** on this 28th day of October, 2015.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE